Thank you, Your Honor. May it please the court. In Question 5, the jury resolved the most central issue of this case, agreeing with TX-IT, that Polaris designed a facility that could not meet the performance guarantee, which is undisputedly the key deliverable of this design-construction contract, that in Questions 9 and 10, the jury rejected Polaris' defenses seeking to be excused from the performance guarantee, and none of those findings are challenged in this appeal, which necessarily means TX-IT should have been the prevailing party in this judgment. I guess I'm going to hope to switch us more to the summary judgment difficulty, because I could see the jury saying, well, they didn't do it, Polaris didn't, because they weren't ever given the chance, the whole failure to allow a performance testing. And that may be the confusion in the case. We know from Question 5 that, based on expert testimony, this facility could not meet the performance guarantee. So they didn't need to go factually try to establish that. Well, they had a lot of witnesses that said it would have been easy to hit $50,000. But the expert testimony is that they could never, under any circumstances, even today, meet the NAPFA yield maximum. That is the part of the performance guarantee that is not included. Oh, the NAPFA, the quant, quant, okay. Correct. But that was fully presented to the jury. Those issues, I mean, you had two irreconcilable stories, market collapse, idle, screw Polaris versus no, operator, errors throughout, you know. Look at two things. First, in Question 5, that question is focusing on the NAPFA yield. In Questions 9 and 10, those excuse questions are focusing on the NAPFA yield. And to answer Polaris' jury argument that they've presented to the court about, you know, that's really what's going on here, there were economic issues. This contract could have been terminated by TXIT for convenience at any time. If it became economically irrational for it to proceed, it had that option. What the facts show is that TXIT proceeded with figuring out what the problem was and hiring experts to go fix the problem. They could get it up to running to $50,000 eventually after massive redesign efforts. They cannot fix the NAPFA yield maximum. That's just something that they will never have, the benefit of the bargain that they sought in this contract. And that Polaris does not answer that. And, frankly, it's because in the evidence it's conceded the facility cannot reach this NAPFA yield maximum. And even in closing argument, they were telling the jury that's impossible. That's why they have those excuse defenses. So let me start with stable operations because that is that summary judgment. Correct. Otherwise, you've got really pivotal witnesses like Kruthmal. Kruthmal, is that how you pronounce the guy's name, who went to the other side? That's right. And he gives a litany of operator errors, not Polaris design flaws. But then your closing argument was he's bought and paid for testimony. So the jury just had a huge, stark choice to make. And that's why I had difficulty just saying, well, the evidence compels an outcome contrary to the verdict or even seeing inconsistency. But I definitely wanted to understand your point about the district court sort of took this. It was an exercise in futility. Right. I mean, consider that in summary judgment what the district court did at Polaris' request was define a major contractual operating milestone. And if you start, I'd like to walk the court through the contract. That's what courts are supposed to do, right? Well. And that's what we do as well. Yes, that's right. I mean, on de novo review, this court can reach the diametrically opposite conclusion. And we would submit that's the right result here. But in section 10.2, look at the heading. It announces stable operation as a major operational milestone. And then look at the text. Because what courts are supposed to do is follow the text, not go straight to dictionaries. And in the text, it starts off with the roles of the parties. At 10.2b, it's Texit that is responsible for achieving stable operations. The contract repeatedly says achieve or establish. And it's on Texit to do that because they're the ones who have the qualified operators to reach the design rate capacity. And your argument is that stable operations has to mean 50,000. Yes. It includes the charge rate. And let me walk you through how you get that into this text in section 10. Your client confirmed in July of 2020 that the facility was, quote, steady, close quote, after six weeks of continuous operation at 30,000. Well, there's evidence going both ways that both parties were saying it is or isn't stable. But they're not talking about the 10.2c definition. Well, specifically, though, the quote that I gave you, and there's plenty of record sites for that, did they say that? Did they use the word steady and say after six weeks of continuous operation at 30,000, the facility was steady? I don't believe it was six weeks. But, Judge Smith, to go straight to some of the facts, if you wanted to jump into the fact issues, there were three. My question was a yes or no question. Did they ever say that? Yes. But we're not defining a contract in that evidence. That's just somebody saying at some point it was running steadily. Well, but if you're talking to us about the common meaning of the word steady, surely we can consider testimony from your own folks as to what steady means. That's where the district court erred, is he went to common meaning rather than contract meaning. Well, in the contract, steady operations is defined in more than one place, but separately from any kind of consideration of 30,000 or 50,000 or naphtha maximum. Correct. So stable operations is distinct from the yield of the products. But the best textual hook in the contract for concluding that the charge rate is part of the meaning of the term stable operations really is in Article 10, and then you're going to look at Appendix G. But let me walk through Article 10. The textual hook for concluding that it's TEXIT that gets to the 50,000 charge rate is partly in Section 10.4B. It's TEXIT that has the qualified operators. Owner shall provide the qualified operators to assist contractor to maintain stable operations. But TEXIT's the one that has the operators to get there in the first place. Then the timing, and this is really critical, Section 10.2B, TEXIT must achieve stable operations within 21 days. Then in C, TEXIT notifies Polaris that stable operations is achieved by providing a notification of stable operations. And in D, Polaris then has 24 hours to agree and certify that stable operations is achieved and start the performance testing. Was there ever a notification or no notification? No, that's undisputed. Our position is it never got to the 50,000 barrels per day. That's undisputed. So really the question is, is the 50,000 barrels per day part of what it means that you're certifying and you give the notification? Did you argue below at the summary judgment stage? I guess there was no hearing, so it would have been the papers. That's right. This is ambiguous. Yes. You did argue that it was ambiguous? Yes. As opposed to, as defined in Appendix G, conclusive, we win? Yes, that it's at a minimum ambiguous. And the court may go there, and that would be fine with us. I mean, we can try this issue to the jury all day long. What changes if you try, if language like 4.12 says, no matter what, whatever amount, it is the owner's obligation to achieve stable operations? That is our position. But if you didn't do it within 21 days, then what does the contract say happens? The contract allows Polaris additional time on the final milestones of their contract. If we can't get there in 21 days, and I think you're hitting on something important. The reason we text it has 21 days is because this is hard to achieve. It's not flipping a switch. True, but Judge Smith is right. Once you get to the five weeks of trial, there's a lot of chatter inside Texas, like we're stable, we're steady, we're ongoing. Is there any evidence internal that we haven't hit 50,000, so even though it looks steady and stable, it's not as a matter of contract? Is there anything? Well, the Polaris admitted. I know Polaris. I'm asking inside the Texas internal stuff. Did anyone ever say, we're talking about stability and steadiness, but we aren't at 50,000, so we can't notify? Well, nobody thought that it had reached that point. Nobody was asking for a notification of stable operations. Did Sullivan even say that in his deposition ever, or did that become his effort to testify at trial? And that's not a plus or minus question to you, because that's your argument is he got caught. Look at the notice of default that Texas sent on September 3rd, 2020. That's in the record at 49319. That's September, right after the three startup attempts, June, July, and August is when Texas was trying to achieve stable operations, and it couldn't. And remember, to go to the fact issues, there was a fire, a flash fire. There was a month-long shutdown. And I have sites for all of this. True, but that was debated, right? There were witnesses who said that was all on you guys. But this is summary judgment. These are fact issues. Oh, okay. So you're saying either it was ambiguous, hence to jury, or whether we achieved or not, fact issue has to go to jury. Correct. Or we win because the contract's clear. It's got to be 50,000 barrels.  That's exactly right. But then the jury turns around and says, we're not really concerned about, we actually aren't concerned about notification. That was immaterial. What was material was you never let them fix the problem that they and their surety are on the line for. Well, no, that you can't assume that this was a fixable problem because it's undisputed that the naphtha yield. Now we're switching to naphtha yield. That's not a fixable problem. So the 50,000 barrels per day goes solely to stable operations. And even if you say it's fine to pick up Webster's and just define it as steady and consistent, which I submit is not faithful to this contract, it was not steady and consistent as a factual matter in the summary judgment record. And all of our exhibits are in the sealed record. There's extensive exhibits outlining safety issues. I think what, I mean, reading the closing especially, the trouble was it seemed sort of compelling that if a contractor's built something new for you, you'd let them try. I know you're saying the evidence from the record shows they never could have done it. Consider that we spent, we ran 800,000 barrels of crude through this facility trying to get to the 50,000 barrel per day charge rate and could never get past 30,000. That's undisputed. Yeah, I agree. So at this point, I mean, that's a lot of crude. We, instead of trying to run performance testing, or calling in the experts to start figuring out what is going on. But Polaris is saying we're the expert. We built this thing. Just give us a chance. We provided them our expert report. We were bringing them in. Right, but you didn't notify, and this is their theory, you didn't notify them that it wasn't stable or... Because it would have been futile for them to run a performance test when it could not even meet that charge rate. And Texas law does not require the performance of a futile act. Okay. Did you ask for a futility instruction yourself? No, but this, I mean, this is all sort of baked into what was tried to the jury. But a little bit when I look at the answers 8 and 9, there is sort of the jury saying, no, we're not, there's no impracticality problem here. 9 and 10. 9 and 10, sorry. Right, right. No, the jury is saying, we agree with Texas. You interpreted this performance guarantee correctly. We won the key interpretation battle of the whole case. And they're saying Polaris was not excused. They are the experts on the design part of this. You were going to tell me, and I interrupted, that there are, in the record, Polaris statements saying no stability, no stable operations. Yes, look at 33557, 31956-357. Polaris internally acknowledged that stable operations were not met in August of 2020, and they sent a letter in August of 2020. This is pre-litigation regarding issues to resolve implicating safety. Is there any way to interpret those? I'll look at them again. I think I did before. Is there any way to interpret that they're saying, we haven't gotten a notification of stability? No. So it's them saying, not stable. Is it because of the barrels per day, or is it because of the three little pop-ups? It's because of the barrels per day. The barrels per day is the only issue that goes to stable operations. And look, there is nothing substantiating that they thought stable operations was ever achieved. And let me just go back to this timing point, because I really want to make sure the court has their argument on this. It's hard to get a facility from zero to 50,000 barrels per day. TXIT has the operators, and contractually, TXIT has the time to do that. But in 10.4a, Polaris starts the performance test as soon as the achievement of stable operations is certified, and then has only three days to run the performance test. So the point is, you have to get to that 50,000 barrels per day and certify everybody agrees that's where we are before you turn it over for collecting the samples of the crew. Section 10.2c ties this notification of stable operations to a meaning that's defined in Appendix G. That's where you turn to Appendix G. And what can we find there? It's not a model of clarity on its own. The clarity comes from Article 10. You really do have to study Article 10 to understand how this all works. But when you turn to Appendix G, what you see is that's where it says stable operations at 50,000 barrels per day. But their answer is that's a performance goal. We were going to get there. Well, I mean, they can say we were going to get there despite not having the operators or the time. That's, again, a jury argument. Contractually, that doesn't make any sense. TXIT has the qualified operators. TXIT has the time. What if Texas had said, you know, during our 21 days, we're just going to run 5,000 barrels per day through? And then they say, tough luck. We never got to stable operations because we're dribbling it through. Would you still say they don't get their chance to come in and performance test? Right, I mean, this contract, and I think your question is sort of buying into their jury argument. Well, I'm going to ask them the opposite, which is how do you artificially peg it at 30,000? Right, that's a great question. How would you answer my harder question to you? Well, I would say if your question is could TXIT act in bad faith and just not do this and just drag their feet, there's dispute resolution procedures in this contract. If Polaris thought that's what was going on in real time, not in their litigation posture, they had remedies to force the issue. The reality was they were actually all working together on the ground. This was not a hostile situation at the time, and we were all trying to get to the 50,000 barrels per day and just couldn't. But I would, and I see my time has expired, I would just emphasize this is summary judgment. There are absolutely fact issues. So let me just ask you a question. You've still reserved all your time for a vote. Thank you. Just ask a question on the court's time. The question is where specifically do you think the district court took a wrong turn that caused the wrong result? And I know your answer is, well, it's all wrong, we should reverse, but I want something specific if you can give it to us as to where was the misunderstanding that caused this erroneous judgment. Specifically, in the summary judgment ruling, when the district court looked at this contract and thought, well, this term isn't defined, even though the contract says that it is, the district court thought, well, the contract's redundant, so the charge rate can't be part of the 50,000, or the definition of staple operations. We've cited Texas law saying in contract drafting, it's actually common to be redundant for clarity, emphasis, or both. And then the district court took his summary judgment ruling and put it in the jury charge. And before the jury even answers question one, they are instructed that the facility achieved staple operations and Texas is in breach in two different ways. That jury charge instruction prejudiced the whole case. And I've got more to that, but I realize. Yeah, no, you specifically answered my question. I've got a question for you on my time.  You say if we should vacate and remand for a new trial, what possible prejudice would there be in redoing a trial considering the first trial took five weeks? This would be a very different trial on remand for several reasons. One, because taking this ruling out of the case and letting it be tried as a factual matter actually streamlines the case quite a bit. The new trial would not have all of this evidence that Flores was trying to put in about bad faith. There would be ways for the parties, I think, to make this a far more efficient, streamlined trial. But the only option here really is to retry the whole case because by instructing the jury that Texas breached, the court essentially directed a verdict on our claims against Westchester in question 13. We could not win that question after this jury was incorrectly instructed. And this prejudiced all the contract claims by having our key witness beat over the head with his correct contract interpretation. So we'd submit this. I think the parties could do a more efficient job on remand, but really the only fair and just result here is a new trial on all these claims. Thank you. Thank you. All right. Thank you, Ms. Pfeiffer. You've saved your full time for rebuttal. Mr. Trachtenberg. Morning, Your Honor. Morning. May it please the court. Texas wrongfully withheld tens of billions of dollars from Polaris because the refinery it hired Polaris to build came online during a generational market disaster for the refining industry. Texas' arguments for undoing many months of work by the district judge and five weeks of work from an attentive jury failed because they rest on an untenable contract interpretation, phantom jury findings that Texit never sought or obtained, and arguments that ignore the high standards of review that Texit cannot clear. I plan to address the stable operations argument first, the judgment formation argument second, and if time is left over, the change order arguments. So first turning to the stable operations issue, the district court properly rejected Texit's bespoke definition of stable operations supposedly derived from Appendix G's listing of nine performance steps. The district court instead construed the phrase correctly by its ordinary meaning in a way that avoids redundancies and contradictions in the contract and harmonizes Appendix G's structure rather than appends it. Appendix G uses stable operations in several places to allocate two different responsibilities. Under Part 1 of owner's responsibilities, it is Texit that must establish stable operations. No rate is specified there. And then in Step 1 of the test procedures, it is Polaris' responsibility to establish and maintain stable operations at a crew rate of 50,000 BPD as part of performance testing. The feed rate is included there because 50,000... But we don't get to performance testing unless you get the notification that we've hit stability. The burden is on Texit to achieve stable operations, which they achieved, as pointed out, all of their internal documentation... I agree, there's a lot of internal documentation, but very effectively also throughout the trial, crossing and then enclosing, Polaris was able to say... And it doesn't matter anyway because the district court's already determined this. The district court made a correct determination because his construction... If the district court didn't make one, there's really no way to avoid a retrial. In other words, your brief at page 31 says Sullivan pretty much gets crucified on this point. He keeps saying, well, we didn't achieve stability, and then ultimately it's, well, that's already been decided by the district court. Well, courts often, as Justice Smith pointed out, construe contracts beforehand, and there's always competing interpretations. He made a strategic choice to completely change his story on performance testing and a lot of other aspects. But I think their argument is, his deposition was, we never achieved it. Then the summary judgment order comes down, and he's told, you have to agree you achieved it. He didn't have to. He could have told the jury, we had a different interpretation of stable operations than the court did, and therefore that was the reason we didn't allow stable operations. Okay, but that's hard because in closing, this is a long trial, but the response was the court, the district court, this is to the jury, right? So Pilaris' closing argument, the court has confirmed itself and instructed you accordingly, page 7. That's this disputed thing. The court will tell you it's been determined stable operations were achieved. That's right. Well, doesn't that decide the verdict? Second question? If stable operations... If they were achieved, but there was no notification, the breach, there's no way not to conclude there's a breach. I agree with you in the sense that if stable operations means what we say it is, and that was not error, that was a correct instruction of his interpretation of the contract. If it was incorrect, then the scope of the retrial is not as broad as the Spicer claim. Okay, so it all turns on whether this little summary judgment motion, little, there was no hearing. There was no hearing. And then the biggest difficulty there, just from contract interpretation, is it says as defined. It does say that, Your Honor, but neither in the seven pages of definitions in Article I, which is the definitional section, or anywhere else in the body of the agreement, nor in Appendix G, does it actually say stable operations means X, because it points to the point... Right, but if the contract itself says stable operations is defined in Appendix G, and no one disputes Appendix G says it's got to be 50,000... Well, only in the context of performance testing. So what Appendix G does is it doesn't embed the term 50,000 BPD into the term stable operations. It just says in various contexts, in the context of performance testing, you have to pursue and accomplish performance testing at 50,000 BPD. During performance testing, you have to have a crew rate fed into the facility at 50,000 BPD. So it is appended to the definition of stable operations. It is not embedded... How do we decide 30 is the magic number? 30 is not the magic number. There's no rate associated with stable operations. It's not a... It is a feature, just the pressures and the temperatures and the flow being steady and consistent and stable. It is... And that's what their own Mr. Krathamo testified to as well, although we don't... That's... We cited several cases talking with industrial plants where stable operations, again, a common industry term is used consistently and interchangeably with the words steady and consistent. And to think about just the rationale here, Your Honor, because if 50,000... If it meant 50,000 BPD before testing, the added phrase at a crew charge rate of 50,000 BPD would be redundant. And there would be no need for Polaris, again, to establish stable operations at 50,000 BPD. If Texas had established it as part of stable operations, Texas interpretation is also nonsensical because Section 10.2 puts the onus on Texas to achieve stable operations. And 10.2D says that if it's not achieved, then Texas has the onus of fixing it at its own cost. Why would it be financially guaranteeing Polaris' accomplishment of the very first performance guarantee? Of course it did not do that. So they built the... Keep it simple. They built the plant, and then we have the confusion about the material completion, but ultimately it's fine. Mechanical completion, that's right. That means it's the owner's. They run it. And they run it for 21 days. It's undisputed they never got up to 50,000. It is. They got to 30,000 stable.   And they don't give you the notification. We were in the dark. Once we hand over the plant at mechanical completion, we expected this to be... This is not supposed to be a big hurdle. The 21 days, this is a big industrial plant. You're running feedstock through it for the first time. You're turning on the equipment for the first time. You're putting heat into it for the first time. But they took the onus of this burden to establish staple operations. And think how odd it is that they're arguing that our burden was really so much higher, 50,000. It was a 21-day thing where they're supposed to get it steady and running. And then we come in, and the very first performance guarantee we have to hit is 50,000 BPD. That's our obligation under performance test. So anytime the 50,000 feed rate is referenced in Appendix G, you can look at it. It's always in connection with that test. It's not embedded in the definition of stable operations itself. And that also is confirmed by the 25,000 BPD testing option at Step 9 in Appendix G. A techs that can choose to run a performance test at 25,000 BPD under the contract, it would make no sense to require stable operations at 50,000 and then start the test at 25,000. Well, it would, right, if they had no problem about volume. They had a problem about how it's coming out in the three component parts. They might say, fine, run it at 25. We just want to see the ratios work out. I could easily see how it's Texas' discretion to say during performance testing, you know, we're not worried about the volume. That issue we've covered. But here they didn't cover it. It never got even close. Well, I want to talk about that in judgment formation because that's their next argument that the plant was fatally defective. And so that feeds into the next point I want to talk about. So first I would just want to say at the outset, this Court doesn't need to even reach the judgment formation arguments or the offset arguments because once techs had accepted the facility, it did not have a viable contract claim. It only had a warranty claim. Happy to get into it. That's in our briefing. That was litigated a lot. But look at the Baker-Hughes versus UE case from Fifth Circuit, which is really, really strong on that point. But Texas' formation arguments fail anyway because they ignore the onerous standards of review set forth in this Court's opinion and Snyder, under which this Court will not disturb the verdict unless there is no view of the case that will make the jury's answers consistent. And reconciliation here is straightforward. The jury could have found that Poiris breached the 50,000 BPD performance guarantee, but that Texas would have identified it and corrected any deficiencies revealed during performance testing. Contrary to their argument, the jury's answer to Question 5 was narrow. It only found that Poiris failed to comply with the performance guarantee. It did not find the breach to be material. It did not find that the facility was unfixable or that it contained a design defect. So is your theory the obvious one that they failed to apply because they were never given the chance? Right. Well, we failed to, I'm sorry to ask that again. The jury answer there makes sense to you because you weren't ever allowed back in? Well, they could have found that it didn't reach 50,000 as the evidence showed it hadn't reached 50,000 yet. And so they could say that it didn't comply with the very first performance guarantee but did not talk about, we don't know which performance guarantee. It doesn't talk about the NAFTA guarantee. And the jury's answer doesn't imply a particular construction of the ambiguity the district court found with respect to the table 2 NAFTA guarantee. So all we know, and easy to reconcile, there's one performance guarantee that it reached 50,000. And then when the jury answers questions 9 and 10, it's obvious that they would say no to those questions if they found a 50,000 BPD violation. Questions 9 and 10 don't inform us anything else about design defect. I urge you to read the jury question 9 and 10 from the perspective of what would they say if they found a 50,000 BPD violation only. Just quick record sites because I asked opposing counsel this. Any record site for a Polaris internal statement saying they hit stable operations? Because you heard her refer to the exhibit that I looked at where they seemed to acknowledge it wasn't at stability. We were not invited. I know, but what about that exhibit statement? The one that she referred to that's in the briefs also where your own people are saying we haven't had an acknowledgement of stable operations? I don't recall what the testimony was on that, Your Honor. I may be misstating it. What about any record evidence that Polaris could have gotten met the NAFTA guarantee? I don't believe, well, I don't believe that there is evidence that we would have met the NAFTA guarantee. Well, the problem there is there's an ambiguity about what the NAFTA guarantee is, right? And that's what the district court found on summary judgment. And the jury's answer to question 5 doesn't imply a resolution. Wait, the district court found? An ambiguity with respect to what table 2 NAFTA guarantee meant. In the summary judgment ruling? In the summary judgment ruling. And so the answer to that ambiguity is not implied by the jury's question 5. Texit is also wrong that the evidence conclusively established Polaris' breach as material. Case law establishes that a jury can find a breach immaterial if it can be cured. And here the agreement's contemplated an iterative test-retest-cure process. And under section 10.4 of the agreement allowed us to fix any deficiencies. Again, the jury heard substantial evidence that Texit would have identified and corrected any deficiencies revealed at its own cost. And very importantly here, state-of-the-art simulations, computer simulations, showed that the facility could have reached 50,000 BPD with a few tweaks. Your Honor, I want to make sure that that is in our brief, but I want to make sure that point was repeated. There's plenty of evidence from multiple experts that the computer simulations that are used as state-of-the-art to establish performance metrics show that the facility could have reached those goals. Texit's separate challenge to question 7's first material breach finding wrongly presumes that Texit's breach was an unfixable design defect. But the ISBL agreement, I want to be clear about this, does not have any design promises in it. It only contains promises about performance. No promises about a particular design. And there was substantial evidence, again, that tech players built the facility with extra capacity beyond the initial design. So the idea that there was a design defect baked in based on an improper code submitted in the software is just not right. And again, those citations in our brief. What does the ISBL say happens if during the 21 days the owner can't hit stable operations? It doesn't really even contemplate that, Your Honor, but it would be their breach theoretically. It's their breach once they hit day 21? That's your position? So why did the district court have to worry about amounts at all? Well, the question is, if they really thought the facility was unfixable, why would they economically claim a breach of stable operations, which was their burden? And then let us put this to the test of performance testing where if they were confident it couldn't perform, then it's unquestionable our burden to fix under the warranty provision. So just from an economic standpoint, you know, that implies, I think, the answer. There's a thought that just vacated my head, but in any case. Well, yeah, related. The agreement of the parties or the stipulation was that as to the summary judgment ruling, the jury would only hear that it, quote, was determined they had achieved stable operations? Yeah, that was the right. It was in the passive. Judge Brown was very protective of their witnesses. He wanted to make sure anything was being used in the passive voice. But then it still became hugely hard for Sullivan. Well, they made some tactical decisions on their side that I think they have to live with. I mean, again, if you made a determination that a court can't make a contractual interpretation ruling pretrial, that's what they're supposed to do, right? They're supposed to interpret contracts that they think should be interpreted as a matter of law. And in every case, you're going to have two parties competing about offering different versions of what the contract means to their witnesses. And one party is going to be stuck. It does seem to come down to that. But then to prevail, you've got to win that it's not even ambiguous. That that Appendix G is only performance goals. It was not part and parcel of stable operations. Your Honor, I- Is that correct? That is correct. And we take that burden on wholeheartedly. We think the judge absolutely got it right. And his interpretation is correct. I do want to make it clear that this is not a cross-cutting issue this court would still have to deal with. The other two contracts. The term is not in the OSBO or DOC agreements. The court would have to deal with the change order issue, the lost profits across appeal points, which it doesn't look like I'm going to have time to address. But- If it did remand, would your conversion and estoppel arguments come back alive? Well, we would argue that you should adjudicate them as part of this appeal now because there is no evidence to support either one of those theories. And there are legal defects with each of them. I have a few minutes left just to cover change orders here, Your Honor. Again, the jury sorted through dozens of 45, I think, change orders in total, compensated only those that it found recoverable under the contracts. Roughly a third, about $8 million out of $24 million that we had asked for. And their generalized sufficiency attack doesn't meet their appellate burden to show no reasonable jury could have found for players on those specific items. There was a lot of chaff thrown in this area. I would point the court just to a couple of case sites. On the written requirement, I would point the court to the Coastal Chem case cited under Brave 35, Southwest 3rd 90 at 100-101, where the court says change order damages were sustained there, notwithstanding a writing requirement where the owner requested it and implicitly approved the change orders. Again, the secondary authority here is pretty clear to Bruner's and O'Connor Construction Law 439 that this requirement of enforcing this written requirement is a pale shadow of its former existence is what Bruner says. And there are all kinds of reasons why, whether waiver, oral modification, prior contract authorization, et cetera, reasons why courts aren't enforcing those. And here we have all the evidence of mutual assent to those agreements and the field representatives approving those change orders that's in our agreement. And then as far as just one other important point on change orders, they can't sabotage the approval process and then hide behind technicalities. They didn't comply with the three-day requirement that they respond to change orders. They didn't name an owner's representative who was the person that was supposed to be designated to deal with us in terms of responding to change orders. Their witness said that their change orders were left languishing in what their employee called a parking lot, putting us in an untenable predicament. Is your theory that they just didn't want this to work? Why would they sabotage? I mean, sabotage means intentionally you want to ruin something. Well, they didn't want to pay for the change orders, Your Honor. They wanted the work to be done. They accepted the work. They saw the work. And they just didn't pay us as the dispute broke out. And that's, I think, just as a larger point, just keeping in mind the framing here, a lot of the evidence that they're pointing to we believe is pretextual and can't be considered from the appellate court's perspective. What we think was really going on here was reflected in our briefing, which is by August 2020, they realized this facility, every barrel of crude they ran through, it was going to be cost of money. And it was a generational market disaster. And they were looking for ways to shut this down. Was that because of market conditions? Yes, Your Honor. That was right after it came. In your view, obviously. Yes. And it's their documents, too, really, that we point to. So COVID hit in March 2020. The facility was supposed to be coming online in August 2020, July 2020, when the performance testing was supposed to be done. And by then, the market had collapsed for refined fuels. And so the evidence is they wanted to table, they wanted to kind of put it offline. They had commercial reasons why they wanted to do that. They didn't want to pay us. And they were in a severe economic predicament by their own internal documents. All right. Thank you, Mr. Truckenberg. Mr. Ward? Thank you, Your Honors. May it please the court? Your Honors, given the very limited amount of time that I have, I'm going to focus in specifically on the question that matters with respect to the surety, which was brought up by opposing counsel. And that's question 13 in the charge. And it very simply asks, did Wettchester fail to comply with the performance bond? And the answer was no. And I would submit to the court that that answer is supported regardless of the decision that's made on the summary judgment. I'm going to say that for two main reasons. One is the question itself specifically set out dutifully the conditions precedent that are set out in the bond itself. Those included that Polaris was in default of the contract, number one. Number two, that there was a declaration of default of Polaris by Texit. And then number three, importantly, that Texit had performed all of its obligations under the ISBL agreement. Important part of a surety bond because unlike the other two parties, the surety is not there. It's just a guarantor. Right. So your brief agrees that third one is the important one. But then you also had a complete protection because the district court had already found they didn't. And that's where I differ. You rise or fall with them on this summary judgment issue. I don't think so, and here's why. Question one was about whether or not it was material that they failed to give notice of stable operations. That was the summary judgment ruling. Point two, or question two, was did they fail, was it material that they failed to give them the chance to do performance obligations? That was the summary judgment question. Question three is important, though. Question three said, did Texit fail to comply with the ISBL agreement in any other way other than as set forth in question one and two, the two summary judgment questions? The jury answered yes. So the jury determined that they had failed to comply with the agreement separate and apart from the two questions that were made the subject of the summary judgment. But that could have been the change orders. We don't know what that was. And quite frankly, the conditions present in the bond don't delineate either that it's material or that it's the first breach because, again, a surety is the one who's not. Just because your time's up, but I'm wrong that your brief agreed that it's really all answer two? Correct. All right. I believe that question three, I believe in what they're saying about question one and two, but question three makes it infallible. Okay. Thank you. All right, thank you, Mr. Ward. Ms. Pfeiffer for rebuttal. Was I making any sense to you on that last question? Yes, and I think you're right. That argument you just heard was forfeited. So may it please the court. What did they say in their brief? They are tying it all rising or falling with Polaris. So if the court agrees with us that this case should be reversed and remanded because of the summary judgment error, Westchester has to go back to. That jury instruction in the charge that we breached became a direct verdict on our claim against Westchester. And that's important because we need the surety in this case. So the court just heard— What would your answer if they—and we will get right waiver or forfeiture. What would you answer if instead for the surety we're looking at answer three from the jury? That, oh, well, Texas violated otherwise, too, out there in the— Well, it probably is better suited to briefing than on the fly in a rebuttal argument. So your only answer in your brief was they're in this with them? Well, that's their only answer, too. So, I mean, we agree with them. You just— So Mr. Trachtenberg made the statement that multiple experts said that they could have reached 50,000 with just a few tweaks. Would you comment on that in terms of what the record tells us? Well, we in fact—Texas, in fact, hired a company to try to fix this design rate capacity issue, and it took far more than tweaks. This took tens of millions of dollars and I believe a year and a half of time, which was more time than Polaris would have had if they had tried to do it themselves under the contract. When we sent them the notice of default, they did not try to fix anything. They sued us, and they tried to— My question was did the experts say that the 50,000 could be reached? Well, it's now reached today at times under a completely redesigned facility. What cannot be reached—and I'd like to correct the record on this. The NAPDA design rate maximum yield cannot be reached. Our reply brief at pages 25 through 27 answers this very fully, and I think you heard them effectively concede that today, but our reply brief gives the record sites. And just, Judge Higginson, to answer your question about what happens if it takes more than 21 days, that's in section 10.3 of the contract. The district court held that stable operations was achieved at 30,000 barrels per day in two-cut mode. You just heard them concede that 30,000 barrels per day does not tie to this contract, and under their logic, any charge rate would be fine for stable operations. That does not give any credit to Article 10 and the timetables and the rules. The case I would encourage the court to read while writing this part of the opinion is the Texas Supreme Court's case in Board of Regents v. IDEXX. It's Chief Justice Heck's unanimous decision in his final year on the court explaining that just because a contract is not clear does not make it ambiguous. And in context, you can work through a contract and find the meaning. This contract says the term is defined in the contract. We're the only party giving a definition that ties to the text of the contract in the appendix, as the contract does in many places. I'd also point the court to the Singleton v. Elephant Insurance case, which is very factually on point. In my last minute and a half, I would like to answer this point about change orders. Article 6 sets out detailed requirements to change the agreement. It must be signed in writing by both parties in the form of Appendix Q and timely. This timeliness requirement actually helps refute some of what the court has heard about all sorts of economic pretexts. They're saying that we were trying to delay or stall out this project. That is not borne out by the record. And that can be sorted out by the jury. But the timing of these change orders actually shows this was a litigation ploy. The vast majority of the change orders were submitted well into the litigation after construction. But is it true that lower-level people approved them? No. They all got stopped by Sullivan? No. The contract requires in 6.4a that the owner has to notify us, that they have to give us two days' notice. All of this has to be countersigned before it's approved. They don't have the documentation in this record to substantiate any of this. And they sought $21 million of change orders. 18 million of those were based on COVID. But they didn't submit them until eight months after construction ended and four months after filing this lawsuit. Before, I mean, well, Judge Smith, let me ask. Joe, thank you. When you stood up, you said reply brief 25 to 27 says what? That's dealing with the NAFTA guarantee. That's the NAFTA guarantee. And what did the district court say at summary judgment about Table 2? That it was ambiguous.  That is the question that got sent to the jury in question number five. And that absolutely captures the NAFTA dispute. You can see it sets out the parties' competing interpretations about NAFTA. That's fine. And the other thing you referred to is 10.3. Were you saying that answers my question about what happens in 21 days if the employer can't achieve? Yes. And what does happen, just in your words? Sure. So TXIT then has more time to keep trying to achieve stable operations, but it doesn't prejudice Polaris on their timetables that are all keyed off of all of this. So Polaris basically gets an extension on its obligations. But you're holding to your statement earlier that the clarity here is from Article 10, not from Appendix G. Yes. I think Appendix G can only be properly interpreted if you really study Article 10.2, 10.4, and see how do the rules work. Because, for example, in Appendix G where it says the first step of the test procedures, and this confused Judge Brown, it says establish and maintain stable operations as the first step of the test procedures. Well, look at 10.2. It's TXIT that establishes it. 10.4b, TXIT provides the qualified operators to then help Polaris maintain stable operations because Polaris is not qualified to do this. They're there to collect the samples, but TXIT is the qualified operators to actually get to the charge rate and help Polaris maintain it during the testing. If I could just briefly return to Judge Brewer's question. Your time has expired unless the judges have any more questions. Thank you. Thank you, Ms. Pfeiffer. Your case is under submission. Thank you. Last case for today.